TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






ON MOTION FOR REHEARING









NO. 03-93-00314-CV







Bryan King and James S. Bumpous, Appellants



v.



Tolbert Foster, Appellee







and



Colorado River Broadcasters, Inc., Appellant



v.



Bryan King and James S. Bumpous, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT


NO. 485,710, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING







 We substitute the following in lieu of our previous opinion issued August 31, 1994. 
Instead of applying the law as it was at the time of the trial, we will apply the current version of
article 2.21 of the Texas Business Corporation Act, because it was meant to apply retroactively
"unless the liability has been finally adjudicated by a court of competent jurisdiction before the
effective date of th[e] Act." Act of May 19, 1993, 73rd Leg., R.S., ch. 215, § 2.26, 1993 Tex.
Gen. Laws 418, 459-60. Because the 1993 amendments to article 2.21 (A) and (B) did not
substantively change the article for purposes of this case, the end result remains the same under
either version of the statute.

 Bryan King and James S. Bumpous ("King/Bumpous") brought an action for breach
of contract against Colorado River Broadcasters, Inc. ("CRB") and against CRB's president,
Tolbert Foster, individually. On the jury's verdict, the trial court rendered judgment against
CRB, and ordered that King/Bumpous take nothing by their claims against Foster. King/Bumpous
appeal the take-nothing judgment in favor of Foster. CRB appeals the judgment against it. We
will affirm the judgment against CRB, reverse the take-nothing judgment against Foster, and
remand that portion of the cause.



THE CONTROVERSY


 In June 1986, Tolbert Foster and his son-in-law, Robert Walker, incorporated
Colorado River Broadcasters, Inc. for the purpose of building and subsequently upgrading a radio
station in Bastrop. (1) Foster provided the financing. Walker supplied the Federal Communications
Commission ("FCC") construction permit that he had previously obtained in his own name, and
managed the building and upgrading of the station. Although Walker and Foster intended to
transfer the construction permit to CRB at some point, they decided to leave it temporarily in
Walker's name. 

 Walker contracted with broadcasting consultants King and Bumpous for consulting
services in connection with the development of the Bastrop station. (2) The consulting agreement
(the "Agreement") provided that in return for consulting and other services, King/Bumpous would
receive 5.5 percent of the net proceeds from the sale of the Bastrop station. King/Bumpous were
unaware of CRB's existence or of its role as the developer of the Bastrop station. (3) On its face,
the Agreement purported to be between King/Bumpous and Walker, and did not mention either
Foster or CRB. Walker signed the Agreement simply, "Robert W. Walker." 

 King/Bumpous performed services through December 1986 on behalf of the Bastrop
station and in accordance with the Agreement. At that time, CRB and Walker contracted to sell
the Bastrop station to Beasley Broadcasting, although Walker was still the record owner. On
January 6, 1987, the completed station requested a new broadcast station license, still reporting
Walker as the station's owner. On January 20, 1987, Walker transferred the permit to CRB.

 On March 30, 1987, CRB and Beasley Broadcasting executed an agreement for sale
of the Bastrop station under which CRB would receive $1 million for the Class A station, and
would receive an additional $3 million plus $1.25 million in non-competition agreements if the
FCC approved an upgrade to a Class C/2 station. 

 Walker informed King/Bumpous of the terms of the sale. He advised them that he
had used the initial $1 million payment to cover costs, and there would be no net proceeds for
distribution until the upgrade was approved. Due to a long delay, the FCC did not approve the
upgrade until early 1989, at which time Beasley Broadcasting made the second payment to CRB. (4) 
CRB distributed all of the proceeds to Walker and Foster. (5) 

 In July 1989, when King/Bumpous were unable to get in touch with Walker, they
contacted Foster and learned that Walker and Foster had received the proceeds from the sale. 
Foster told them he knew nothing about the Agreement. (6) CRB no longer actively engages in
business and its only remaining asset is a 32-acre tract of land in Burnet County. (7) CRB is unable
to pay King/Bumpous the amount owed under the Agreement. 

 King/Bumpous sued CRB to recover under the Agreement on alternate theories: 
(1) CRB was Walker's undisclosed principal in the Agreement; or (2) CRB ratified the
Agreement. The jury found CRB liable on both theories and fixed damages in the amount of
$147,573.69, representing 5.5 percent of the net proceeds from the sale of the Bastrop station. 
Additionally, King/Bumpous sought to recover contract damages against Foster (8) under alternative
theories: (1) Foster had used CRB as his alter ego; or (2) Foster had "denuded" CRB by
distributing substantially all of its assets, thus rendering it incapable of paying its debts. The jury
failed to find Foster liable under either theory. These appeals ensued. 



UNDISCLOSED PRINCIPAL THEORY


Parol Evidence.

 In its first point of error, (9) CRB asserts the trial court erred in submitting the case
to the jury on the theory that CRB was Walker's undisclosed principal. (10) CRB contends that the
Agreement unambiguously indicates that Walker, not CRB, contracted with King/Bumpous, and
therefore, parol evidence was inadmissible to vary its terms. (11) CRB concludes that the trial court
should have construed the Agreement as a matter of law with respect to the identity of the
contracting parties, rather than submitting the issue to the jury. King/Bumpous respond that parol
evidence was admissible to prove CRB was Walker's undisclosed principal, and that Walker was
acting as CRB's agent. We agree.

 When an agent acts within the scope of his authority and contracts in his own name
on behalf of an undisclosed principal, the contract is enforceable against the principal. First Nat'l
Bank v. Fite, 115 S.W.2d 1105, 1109-10 (Tex. 1938); Sanger v. Warren, 44 S.W. 477, 478 (Tex.
1898). (12) Parol evidence is admissible to reveal the identity of the principal and hold him liable
on a contract made for his benefit. Heffron v. Pollard, 11 S.W. 165, 166 (Tex. 1889); Nelson
v. Texas Power & Light Co., 543 S.W.2d 26, 27 (Tex. Civ. App.--Waco 1976, no writ). Such
extrinsic evidence does not vary the terms of the contract, but brings in a new party whom the law
binds because of his relationship to the agent. Heffron, 11 S.W. at 166. Thus, the fact that the
contract does not reveal the agency of the signing party or the principal's name is not conclusive
evidence that the principal was not a party to the contract. Jordan v. Rule, 520 S.W.2d 463, 465
(Tex. Civ. App.--Houston [1st Dist.] 1975, no writ). Moreover, the party with whom the agent
contracts has no duty to discover the existence of an agency or the identity of the principal. 
Hideca Petroleum Corp. v. Tampimex Oil Int'l Ltd., 740 S.W.2d 838, 842 (Tex. App.--Houston
[1st Dist.] 1987, no writ). Rather, the agent has the duty to disclose the agency relationship. Id. 


 In the present case, King/Bumpous were entitled to introduce parol evidence to
establish CRB was Walker's undisclosed principal to the Agreement. We conclude the trial court
did not err in admitting parol evidence on this issue and submitting the question to the jury. We
overrule CRB's first point of error.



Jury Instructions On Actual Authority.

 In its third point of error, CRB contends the trial court erred in overruling its
objection to the instruction on actual authority included in Question No. 1 because the instruction
was an improper statement of the law. Question No. 1 and the accompanying instructions were
as follows:



 Did Colorado River Broadcasters, Inc. contract with Bryan King and Steve
Bumpous for performance of the services outlined in the Consulting Agreement?


 In deciding whether the parties reached an agreement, you may consider what
they said and did in light of the surrounding circumstances, including any earlier
course of dealing. You may not consider the parties' unexpressed thoughts or
intentions.


 A corporation's conduct includes the conduct of a person who acts with the
corporation's authority. 


 You are further instructed that "actual authority" for a person to act for a
corporation arises from the corporation's agreement that the person act on behalf
and for the benefit of the corporation. If a corporation so authorizes a person to
perform an act, that person is also authorized to do whatever is proper, usual, and
necessary to perform the act expressly authorized. "Actual authority" also includes
the authority that the corporation either intentionally or by want of due care allows
the person to believe he has to represent the corporation.



 Specifically, CRB asserts (1) the trial court did not give the proper instruction on
implied actual authority that this Court approved in Duval County Ranch Co. v. Wooldridge, 674
S.W.2d 332, 334 (Tex. App.--Austin 1984, no writ); and (2) the "hybrid actual
authority/negligence instruction" is an incorrect statement of the law. 

 A principal confers actual authority on an agent by conduct that either intentionally
or negligently allows the agent to believe he or she has been given actual authority to represent
the principal. Polland & Cook v. Lehmann, 832 S.W.2d 729, 738 (Tex. App.--Houston [1st Dist.]
1992, writ denied); Austin Teachers Fed. Credit Union v. First City Bank-Northwest Hills, 825
S.W.2d 795, 799 (Tex. App.--Austin 1992, writ denied). Actual authority includes both express
and implied authority. Polland & Cook, 832 S.W.2d at 738. Implied authority is the authority
to do all things proper, usual, and necessary to exercise any authority granted to a person. Duval
County Ranch Co., 674 S.W.2d at 334. 

 Contrary to CRB's assertion, the final paragraph of the above-quoted portion of the
charge does in fact include a correct definition of implied actual authority as expressed in Duval
County Ranch Co. Id. Moreover, as stated above, a principal may negligently confer actual
authority on an agent by conduct that leads the agent to believe he has authority to act on behalf
of the principal. (13) We conclude the trial court did not err in overruling CRB's objection to the
charge. We overrule CRB's third point of error.

 In its fourth point of error, CRB contends the trial court abused its discretion in
refusing CRB's request to submit to the jury the following instruction on course and scope of
authority under Question No. 1:



 You are instructed that before you answer "Yes" to this question, you must find
both that Robert Walker had authority on behalf of Colorado River Broadcasters,
Inc. to execute the "Consulting Agreement" in its behalf, and that Robert Walker
executed the "Consulting Agreement" while in the scope of his duties as an officer
of Colorado River Broadcasters, Inc., as distinguished from his individual capacity
as holder of the FCC approved KSSR-FM construction permit.



 CRB's position is that the charge, as given, did not advise the jury that in order to
find CRB was a party to the Agreement, they first had to find Walker acted within the course and
scope of his authority when he contracted with King/Bumpous. King/Bumpous rejoin that the
instructions did in fact strictly limit the jury's consideration to Walker's actions it found to be
within the scope of his authority. 

 It is a basic rule of agency that the principal is not liable to a third party for an
agent's acts in excess of his authority. Webb v. Webb, 602 S.W.2d 127, 129 (Tex. Civ.
App.--Austin 1980, no writ). (14) It was therefore incumbent upon King/Bumpous to secure a jury
finding that Walker's conduct in contracting with King/Bumpous was within the scope of his
actual authority, either express or implied. See Pasadena Assocs. v. Connor, 460 S.W.2d 473,
479 (Tex. Civ. App.--Houston [14th Dist.] 1970, writ ref'd n.r.e.) (stating that a finding of agency
alone is insufficient without a finding that acts in question were within scope of agent's authority). 


 The trial court must submit such instructions and definitions as are proper to enable
the jury to render a verdict. Tex. R. Civ. P. 277. This rule affords the trial court broad
discretion in determining what instructions to submit. Mobil Chem. Co. v. Bell, 517 S.W.2d 245,
256 (Tex. 1974). An instruction is proper if it finds support in any evidence of probative force
and if it might assist the jury in answering the questions submitted. Louisiana & Ark. Ry. v.
Blakely, 773 S.W.2d 595, 598 (Tex. App.--Texarkana 1989, writ denied). 

 In the present case, the trial court instructed the jury that a corporation's conduct
included the conduct of a person who acted with the corporation's authority, and correctly defined
the law on actual authority. By finding that CRB was a party to the Agreement, the jury
necessarily found Walker acted within his actual authority in contracting with King/Bumpous. 
Any acts Walker had actual authority to perform were within the course and scope of his
authority. Thus, the trial court did not abuse its discretion in refusing CRB's requested
explanatory instruction when its substance was already included in the charge. See id. at 599. 
CRB was not entitled to submission of a requested instruction when it was merely a shade or
repetition of an instruction already in the charge. See Tex. R. Civ. P. 278; Yellow Cab &
Baggage Co. v. Green, 277 S.W.2d 92, 94-95 (Tex. 1955); Louisiana & Ark. Ry., 773 S.W.2d
at 599. In fact, the trial court should refuse to submit unnecessary instructions even if they
correctly state the law. Louisiana & Ark. Ry., 773 S.W.2d at 599. 

 We conclude the trial court did not abuse its discretion in refusing to submit CRB's
requested instruction. We overrule CRB's fourth point of error.



Legal and Factual Sufficiency of the Evidence.

 In its fifth point of error, CRB asserts that the evidence was legally insufficient,
or in the alternative, factually insufficient, to support the jury's answer to Question No. 1. CRB
contends that Walker's out-of-court statements, reported by King/Bumpous, were the sole
evidence of Walker's agency relationship with CRB, and that such statements are the equivalent
of no evidence. See Texoma Broadcasting Co. v. Darter, 296 S.W.2d 277, 278 (Tex. Civ.
App.--Fort Worth 1956, no writ) (stating declarations of purported agent incompetent to establish
either agency or scope of authority). A complaint that the evidence was factually insufficient to
support a jury finding must be raised by a motion for new trial. Tex. R. Civ. P. 324(b)(2); Tex.
R. App. P. 52(d). Because CRB did not file a motion for new trial, it waived its factual
insufficiency point. (15) 

 In reviewing legal insufficiency points, we must consider only the evidence and
inferences that tend to support the finding and disregard all evidence and inferences to the
contrary. Stafford v. Stafford, 726 S.W.2d 14, 16 (Tex. 1987). If there is any evidence of
probative force to support the finding, we must overrule the point and uphold the finding. In re
King's Estate, 244 S.W.2d 660, 661 (Tex. 1951). No-evidence points may be sustained only
when the record discloses (1) a complete absence of evidence of a vital fact; (2) the court is barred
by rules of law or of evidence from giving weight to the only evidence offered to prove a vital
fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the
evidence established conclusively the opposite of a vital fact. Cecil v. Smith, 804 S.W.2d 509,
510 n.2 (Tex. 1991).

 King/Bumpous had the burden of proving Walker was acting as CRB's duly
authorized agent in contracting with them. (16) See Buchoz v. Klein, 184 S.W.2d 271 (Tex. 1944);
Moore v. Office of the Attorney Gen., 820 S.W.2d 874, 877 (Tex. App.--Austin 1991, no writ)
(stating one who relies on existence of agency relationship or asserts act was within scope of
agent's authority has burden of proving such allegations by preponderance of evidence). The
status of agency is one of ultimate fact derived from underlying facts and may be found from
either direct or circumstantial evidence. Stanford v. Dairy Queen Prods., 623 S.W.2d 797, 800-01 (Tex. App.--Austin 1981, writ ref'd n.r.e.). 

 Agency is a consensual relationship between two parties in which one acts on behalf
of the other, subject to the other's control. Noble Exploration, Inc. v. Nixon Drilling Co., 794
S.W.2d 589, 592 (Tex. App.--Austin 1990, no writ); see also Hartford Casualty Ins. Co. v.
Walker County Agency, Inc., 808 S.W.2d 681, 687 (Tex. App.--Corpus Christi 1991, no writ)
(stating agent is authorized by another to transact business on the other's behalf); American
Employers Ins. Co. v. Kilgore, 412 S.W.2d 67, 69 (Tex. Civ. App.--Amarillo 1967, writ ref'd
n.r.e.) (noting no agency exists if party not acting on another's behalf). Agency exists through
the express or implied contract of the parties, or is created by law. Green v. Hannon, 369
S.W.2d 853, 856 (Tex. Civ. App.--Texarkana 1963, writ ref'd n.r.e.). (17) An agency relationship
may only arise at the will and by the act of the principal, and its existence must be proved by
tracing it to some act of the principal. Thermo-Products Co. v. Chilton Indep. Sch. Dist., 647
S.W.2d 726, 732 (Tex. App.--Waco 1983, writ ref'd n.r.e.). 

 There is no presumption that actions of corporate agents are within the scope of
their authority. Cotton Belt R.R. v. Hendricks, 768 S.W.2d 865, 870 (Tex. App.--Texarkana
1989, no writ). Rather, the power of a corporate agent to bind the corporation depends upon the
authority conferred by the bylaws, charter, and resolutions of the directors, as well as the general
rules governing principal and agent. Tex. Bus. Corp. Act Ann. art. 2.42(B) (West 1980); Hanson
Southwest Corp. v. Dal-Mac Const. Co., 554 S.W.2d 712, 719 (Tex. Civ. App.--Dallas 1977, writ
ref'd n.r.e.). (18) The corporation may confer actual authority on an agent either expressly or by
implication. Hanson Southwest Corp., 554 S.W.2d at 719. Thus, actual authority of an agent
may be implied from the nature of his position, or from the corporation's custom or habit of doing
business. Templeton, 555 S.W.2d at 537; see also Citizen's Bridge Co. v. Guerra, 248 S.W.2d
538, 541 (Tex. Civ. App.--San Antonio 1952), rev'd in part on other grounds, 258 S.W.2d 64
(Tex. 1953); 20 Robert W. Hamilton, Business Organizations § 582, at 49 (Texas Practice 2d
ed. 1973) (stating agent's actual authority may be implied from board of directors' long
acquiescence in agent's exercising authority in question); 2 Ira P. Hildebrand, The Law of Texas
Corporations § 639, at 588 (1942) (stating that if directors acquiesce to agent conducting business
without interference, such agent has express authority co-extensive with directors' authority to
bind corporation).



Review of Evidence.

 The following evidence supports the jury's finding that Walker was CRB's agent
acting within the scope of his authority when he contracted with King/Bumpous.

 Bryan King testified that Walker conducted all contract negotiations concerning the
radio station such as acquiring the transmitter, the studio equipment, and the land in Bastrop and
Burnet; King stated that Walkder was "the point man for the whole project." King testified that
he and Bumpous constructed the station under a separate agreement. In connection with that
work, they billed the station "KSSR" for $5,310 in March 1987, and CRB paid the bill. Walker
never instructed King not to mention the consulting agreement to Foster. 

 Steve Bumpous testified that Walker acted on a daily basis on behalf of the Bastrop
station. He hired and fired employees, ordered equipment, negotiated a lease for the building,
and made arrangements for satellite programming. Walker hired King and Bumpous to construct
the station under a separate agreement and CRB paid the bill.

 Robert Walker testified by deposition that he had whatever authority the corporate
documents conferred on him. He stated he took a more active role than Foster in pursuing the
upgrade, and did all of the work. He was unaware of any restrictions that CRB placed on his
right to pursue the upgrade.

 Tolbert Foster testified he loaned Walker the money to purchase the construction
permit. Walker was to contribute the construction permit and the plans for an upgrade and Foster
was to contribute the financing. Because of tax considerations, Foster and Walker agreed to form
a subchapter S corporation as the entity through which to develop the Bastrop station. From the
beginning, they intended to transfer the construction permit to CRB when it became convenient. 

 CRB's certificate of incorporation, dated June 6, 1986, listed Foster and Walker
as directors. Foster testified that at the first meeting the board approved the by-laws, and elected
Foster as president and Walker as vice-president and secretary. The corporation issued 700 shares
to Foster and 300 shares to Walker. The by-laws provided that the vice-president "shall perform
the duties and have the authority and exercise the powers of the president. [He] shall perform
such other duties and have such other authority as the . . . president may from time to time
delegate." The president "shall have general and active management and control of the business
and affairs of the corporation . . . ."

 Foster stated he was not aware of any restrictions, outside the corporate documents,
placed on Walker's authority to act for CRB. Foster testified he and Walker had no delineation
of duties; they just did things as they came up. However, Walker did the active footwork. Foster
admitted that Walker made arrangements for the studio, the equipment, and rented tower space,
all in his own name, and CRB paid the bills. Foster conceded that many of the contracts Walker
made in his own name, and that CRB paid, were not formally approved by the board of directors. 
Both he and Walker wrote checks on the corporate checkbook. 

 Janette Hawkins testified that at the time of the events in this suit, she was the
president of Hawkins Broadcasting which owned KHLB, a radio station located in Burnet, Texas. 
Hawkins Broadcasting contracted with the Bastrop station wherein the Bastrop station agreed to
compensate Hawkins Broadcasting for KHLB to change frequencies and move its tower site. 
Negotiations over the deal continued for several months, largely with Walker. The parties
executed a final written agreement in December 1986. Walker signed the contract simply as
"Robert W. Walker." The contract does not mention CRB, although CRB is the entity that paid
Hawkins Broadcasting under the contract. 

 Robert Botik testified that he did sales consulting work for the Bastrop station
between January and May 1987, and that Walker represented the Bastrop station in all their
dealings.

 Based on the foregoing summary, we conclude the body of evidence provided a
reasonable basis for concluding that Walker was CRB's agent in developing the Bastrop station,
and that he acted within his authority in hiring King and Bumpous under the Agreement. We
overrule CRB's fifth point of error.



Admissibility of Walker's Out-of-Court Statements.

 In its second point of error, CRB asserts the trial court erred in admitting into
evidence Walker's out-of-court statements, as reported by King/Bumpous, to prove Walker had
authority to bind CRB to the Agreement. (19) CRB contends that the existence of an agency depends
on the purported principal's conduct, and that statements of an alleged agent, standing alone, are
legally insufficient to establish agency or the scope of authority. (20) CRB maintains that there was
no evidence that either CRB or Foster did anything to indicate Walker had authority to bind CRB
to the Agreement, and therefore Walker's out-of-court statements were inadmissible to prove his
actual authority. 

 King/Bumpous argue there was an abundance of other evidence to establish that
Walker was CRB's duly authorized agent, and therefore, Walker's statements were admissible as
party admissions under Texas Rule of Civil Evidence 801(e)(2)(D) and as corroboration of other
evidence of agency. 

 An alleged agent's out-of-court declarations, standing alone, are insufficient to
establish agency or the scope of authority, but once there is prima facie evidence to show the fact
of agency, such statements may be admitted in corroboration. McAfee v. Travis Gas Corp. 153
S.W.2d 442, 448 (Tex. 1941); Thermo-Products Co., 647 S.W.2d at 733. (21) An out-of-court
statement is not hearsay if it is offered against a party and is "a statement by his agent or servant
concerning a matter within the scope of his agency or employment, during the existence of the
relationship . . . ." Tex. R. Civ. Evid. 801(e)(2)(D). Thus, an out-of-court statement is
admissible under Rule 801(e)(2)(D) if: (1) the declarant was the party's agent, (2) at the time he
made the statement, and (3) the statement concerned a matter within the scope of the agency. (22) 
See Fojtik v. First Nat'l Bank, 752 S.W.2d 669, 672 (Tex. App.--Corpus Christi 1988), writ
denied per curiam, 775 S.W.2d 632 (Tex. 1989); State v. Buckner Constr. Co., 704 S.W.2d 837,
846 (Tex. App.--Houston [14th Dist.] 1985, writ ref'd n.r.e.). 

 If there is a dispute regarding whether an agency relationship in fact existed or
whether the statement concerned a matter within the scope of the agency, the issue is for the court
to determine before admitting the statement into evidence. See Handel v. Long Trusts, 757
S.W.2d 848, 851 (Tex. App.--Texarkana 1988, no writ) (holding trial court properly excluded out-of-court statement when record did not show it concerned matter within scope of declarant's
employment); Norton v. Martin, 703 S.W.2d 267, 272 (Tex. App.--San Antonio 1985, writ ref'd
n.r.e.) (holding trial court properly excluded statements when evidence did not establish declarant
was party's employee or agent).

 After CRB objected to the admission of Walker's out-of-court statements as
evidence of his alleged authority to contract on CRB's behalf, the trial court ruled such testimony
admissible under rule 801(e)(2)(D), subject to the introduction of evidence sufficient to support
a finding that Walker was acting within the scope of his authority. See Tex. R. Civ. Evid. 104(b)
(providing that when relevancy of evidence depends on fulfillment of condition of fact, court shall
admit it subject to introduction of evidence sufficient to support a finding of the fulfillment of the
condition). The inquiry, then, is whether there was evidence apart from Walker's out-of-court
statements regarding his agency status and scope of authority in connection with CRB.

 Based on our review of the evidence in connection with CRB's legal insufficiency
point above, we conclude that there was independent evidence that Walker was CRB's agent and
that he acted within the scope of his authority in contracting with King/Bumpous for consulting
services. Specifically, we refer to Foster's testimony regarding the fact that Walker did all of the
necessary contracting for the Bastrop station and CRB paid the bills. Foster stated further that
CRB never restricted Walker's power to act on its behalf other than in the by-laws, which
conferred generally the power to actively manage and control corporate business. We conclude
the trial court did not err in admitting Walker's out-of-court statements regarding his agency for
CRB and the scope of his authority. We overrule CRB's second point of error. 

 Because we will affirm the judgment against CRB on the ground that CRB was
Walker's undisclosed principal, any error in connection with the alternate ground of ratification
is harmless. See Port Terminal R.R. Ass'n v. Richardson, 808 S.W.2d 501, 508 (Tex.
App.--Houston [14th Dist.] 1991, writ denied); Federal Pac. Elec. Co. v. Woodend, 735 S.W.2d
887, 896 (Tex. App.--Fort Worth 1987, no writ); Tex. R. App. P. 81(b)(1); 6 Texas Civil Practice
§ 48:8 & n.70 (Diane M. Allen et al. eds., 1992 ed.). We therefore need not address CRB's
points of error eight through fourteen, complaining of error regarding the ratification theory. We
also need not address CRB's sixth and seventh points of error asserting the trial court erred in
denying CRB's motion for summary judgment and CRB's motion for judgment notwithstanding
the verdict. 



ATTORNEY'S FEES


 In its fifteenth and sixteenth cross points of error, CRB asserts the trial court erred
in submitting a question regarding King/Bumpous's attorney's fees to the jury, and in
subsequently refusing to modify the judgment to omit their recovery of attorney's fees. CRB
argues that King/Bumpous failed to plead and prove proper presentment of their claim to CRB as
required by section 38.002(2) of the Texas Civil Practice & Remedies Code. See Tex. Civ. Prac.
& Rem. Code Ann. § 38.002(2) (West 1986). (23) Section 38.002(2) provides that in order to
recover attorney's fees under chapter 38 "the claimant must present the claim to the opposing
party or to a duly authorized agent of the opposing party . . . ." (Emphasis added). 
King/Bumpous respond that the record reflects they sent notice of their claim to Foster, CRB's
registered agent.

 A prerequisite for recovery of attorney's fees is a presentment of the claim to the
opposing party and that party's failure to tender performance within thirty days of presentment. 
Jones v. Kelley, 614 S.W.2d 95, 100 (Tex. 1981); Jim Howe Homes, Inc. v. Rogers, 818 S.W.2d
901, 904 (Tex. App.--Austin 1991, no writ). The purpose of the presentment requirement is to
afford the party against whom it is asserted an opportunity to pay the claim and thereby avoid
incurring an obligation to pay attorney's fees. Jones, 614 S.W.2d at 100; Carrington v. Hart, 703
S.W.2d 814, 818 (Tex. App.--Austin 1986, no writ). The record reflects that King/Bumpous
complied with section 38.002(2) by presenting their claim to Foster, CRB's duly authorized agent,
as the statute permits. See Richard Gill Co. v. Jackson's Landing, 758 S.W.2d 921, 927 (Tex.
App.--Corpus Christi 1988, writ denied) (holding presentment of claim to partner constituted
presentment to partnership). We overrule CRB's fifteenth and sixteenth points of error. 



DENUDING THEORY


Proof of Actual Fraud.

 In their first point of error, King/Bumpous assert the trial court erred in its
submission of the denuding theory by requiring them to prove Foster used CRB to perpetrate an
actual fraud. Question No. 4 and the jury's response were as follows:



 Did Tolbert Foster cause Colorado River Broadcasters, Inc. to be used to
perpetrate an actual fraud on Bryan King and Steve Bumpous, primarily for the
direct personal benefit of Tolbert Foster, by distributing all or substantially all of
the corporation's assets to its shareholders, with the result that the corporation was
rendered incapable of paying its debts?


 ANSWER: NO



(Emphasis added). A definition of actual fraud accompanied Question No. 4. The source of the
italicized portions, of which King/Bumpous complain, is article 2.21 of the Texas Business
Corporations Act. Article 2.21 provides:



A.  A holder of shares . . . shall be under no obligation to the corporation or to its
obligees with respect to:


. . .

 

 (2) any contractual obligation of the corporation on the basis that the holder . .
. is or was the alter ego of the corporation, or on the basis of actual or constructive
fraud, or a sham to perpetrate a fraud, or other similar theory, unless the obligee
demonstrates that the holder . . . caused the corporation to be used for the purpose
of perpetrating and did perpetrate an actual fraud on the obligee primarily for the
direct personal benefit of the holder . . . .


B. The liability of a holder . . . of a corporation for an obligation that is limited
by Section A of this article is exclusive and preempts any other liability imposed
on a holder . . . of a corporation for that obligation under common law or
otherwise, except that nothing contained in this article shall limit the obligation of
a holder . . . to an obligee of the corporation when:


 (1) the holder . . . has expressly assumed, guaranteed, or agreed to be personally
liable to the obligee for the obligation; or


 (2) the holder . . . is otherwise liable to the obligee for the obligations under this
Act or another applicable statute. 


. . . .



Tex. Bus. Corp. Act Ann. art. 2.21 (West Supp. 1995). 

 King/Bumpous argue that article 2.21 applies solely to theories which function to
disregard the corporate entity and impose personal liability on the shareholder. They assert the
denuding theory does not disregard the corporate entity because it does not impose unlimited
personal liability on shareholders for corporate obligations, but merely traces and attaches to
corporate assets in the hands of shareholders. 

 In interpreting a statute we must ascertain the legislature's intent. Minton v. Frank,
545 S.W.2d 442, 445 (Tex. 1976); see also Tex. Gov't Code Ann. § 312.005 (West 1988). We
begin with an analysis of the statute. Cail v. Service Motors, Inc., 660 S.W.2d 814, 815 (Tex.
1983). 

 The theories of actual fraud, constructive fraud, sham to perpetrate a fraud, and
other similar theories enumerated in article 2.21(A)(2) are different grounds on which a court may
disregard the corporate entity and impose personal liability on shareholders for corporate
obligations. (24) See Castleberry v. Branscum, 721 S.W.2d 270, 272-73 (Tex. 1986). Foster does
not dispute this contention, but instead argues that the denuding theory is in fact a means to pierce
the corporate veil, and therefore, is covered by the "actual fraud" requirement of article
2.21(A)(2).

 The supreme court has stated that under the denuding theory a court does not
disregard the corporate entity. Castleberry, 721 S.W.2d at 271 n.1. (25) The court first recognized
the denuding theory in World Broadcasting System, Inc. v. Bass, 328 S.W.2d 863 (Tex. 1959). 
In that case, the stockholders of a corporation sold all its assets and distributed the proceeds to
themselves. In consequence, the corporation was unable to pay its contractual obligation to
World Broadcasting. The supreme court stated the stockholders had "denuded" the corporation
of its assets and therefore deprived corporate creditors of any funds from which to collect claims. 
Id. at 864. The court held the stockholders liable for the corporation's outstanding debts to the
extent of the corporate assets they had appropriated. Id. at 864, 866. The rationale for imposing
liability on the assets the stockholders received was as follows:



 The law which sends a corporation into the world with the capacity to act
imposes upon its assets liability for its acts. The corporation cannot disable itself
from responding by distributing its property among its stockholders, and leaving
remediless those having valid claims. In such a case the claims, after being
reduced to judgments, may be satisfied out of the assets in the hands of the
stockholders.


 [W]hen a corporation divests itself of all its assets by distributing them among
the stockholders, those having unsatisfied claims against it may follow the assets
. . . . A corporation cannot by divesting itself of all of its property, leave
remediless the holder of a contingent claim, or the obligee of an executory contract
. . . .



Id. at 864-65 (quoting Pierce v. United States, 255 U.S. 398 (1920)). 

 Under the denuding theory, the shareholder is liable for the corporate obligation
only to the extent of the corporate assets received. Id. at 864, 866; A.R. Clark Inv. Co. v. Green,
375 S.W.2d 425, 437 (Tex. 1964); Fagan v. La Gloria Oil & Gas Co., 494 S.W.2d 624, 633
(Tex. Civ. App.--Houston [14th Dist.] 1973, no writ); Burton Mill & Cabinet Works, Inc. v.
Truemper, 422 S.W.2d 825, 827 (Tex. Civ. App.--Waco 1967, writ ref'd n.r.e.). Conversely,
when a court disregards the corporate entity, personal liability for the full amount of the corporate
obligation is imposed on the individual; his possession of any assets is immaterial to the issue of
liability vel non. (26) Under the denuding theory the court recognizes the corporation's separate
identity by tracing corporate assets into the hands of shareholders. The corporate assets that a
shareholder has received simply define the extent or amount of the shareholder's liability. 
Because the denuding theory does not involve the piercing of the corporate veil, Foster's claim
that the denuding theory is the equivalent of actual fraud must fail.

 


Proof of constructive fraud or other similar theories.

 Foster further argues that the denuding theory is a form of constructive fraud, and
thus falls within article 2.21(A)(2) on that basis. On the contrary, in decisions addressing
shareholder liability for corporate obligations, "constructive fraud" is a ground on which a
claimant may pierce the corporate veil without the burden of proving actual fraud. See
Castleberry, 721 S.W.2d at 273. (27) We do not agree with Foster's contention that the denuding
theory is a form of constructive fraud. 

 In a final effort to fit the denuding theory within article 2.21(A), Foster contends
that the legislature intended to include the denuding theory in article 2.21(A)(2) by inserting the
words "or other similar theory." However, every theory specifically listed in article 2.21(A)(2)
is a "piercing the corporate veil theory," and similarly, any other theory included in this article
must also involve piercing the corporate veil. 



Under the rule of ejusdem generis, where specific and particular enumerations of
persons or things in a statute are followed by general words, the general words are
not to be construed in their wildest meaning or extent, but are to be treated as
limited and applying only to persons or things of the same kind or class as those
expressly mentioned.



Standford v. Butler, 181 S.W.2d 269, 272 (Tex. 1944) (holding statute providing that "candidates
for Governor and for all other State offices" did not include the position of presidential elector
since the Governor is a State office and an elector is a position created by the U.S. Constitution)
(citing Farmers' & Mechanics' Nat'l Bank v. Hanks, 137 S.W. 1120, 1124-25 (Tex. 1911)). We
therefore sustain King/Bumpous's first point of error.



Submission of the Denuding Theory.

 In his first cross-point of error, Foster asserts the trial court should not have
submitted the denuding theory to the jury because it is not applicable to this case and
King/Bumpous failed to tender a question on the denuding theory in substantially correct wording. 
See Tex. R. Civ. P. 278. The trial court refused King/Bumpous's request to submit the following
question:



 Were all or substantially all of the assets of Colorado River Broadcasters, Inc.
distributed to its stockholders, with the result that the corporation was rendered
incapable of paying its debts? (28)



 Specifically, Foster argues that in the cases applying the denuding theory all (not
"substantially all") of the corporation's assets were distributed to stockholders. See, e.g., World
Broadcasting Sys., 328 S.W.2d at 863-64; Inesco, 567 S.W.2d at 830. Foster contends the
denuding theory does not apply to this case because CRB continues to own a piece of land in
Burnet County. (29) 

 Although cases applying the denuding theory involve situations in which all of the
corporate assets were distributed, the rationale of the theory is that the law imposes on corporate
assets liability for a corporation's acts. World Broadcasting Sys., 328 S.W.2d at 864. Therefore,
a corporation may not disable itself from satisfying its creditors' claims by distributing its assets
among shareholders so as to leave without remedy those having valid claims. Id. at 863-64; A.
R. Clark Inv., 375 S.W.2d at 437. In World Broadcasting System, the supreme court noted that
the corporation had been "stripped of its property as completely and effectively as if it had been
dissolved and its assets appropriated by respondents." World Broadcasting Sys., 328 S.W.2d at
866.

 In the present case, the following facts are undisputed: Foster and Walker
organized CRB for the sole purpose of developing, upgrading, and eventually selling the Bastrop
station. The station has been sold, and all of the proceeds have been distributed. Although Foster
and Walker have not formally dissolved CRB, neither plans to conduct business through it. Even
though CRB continues to own a piece of land in Burnet, its value is small in relation to the
corporate assets distributed. CRB's distribution of the net proceeds from the sale of the Bastrop
station to Foster and Walker rendered CRB unable to pay its debt to King/Bumpous. 
King/Bumpous are left with no remedy. We do not believe that each and every asset must be
distributed before the denuding theory applies. When the policies, purposes, and rationale behind
the theory are applicable, the theory applies. They apply here and the expression referring to a
distribution of "substantially all" the corporate assets accurately posed the issue for the jury when
joined with the remainder of the query. We overrule Foster's first cross-point of error.



Exceptions to exclusive liability under 2.21(B).

 Foster points to article 2.21(B) for the proposition that his liability under a
denuding theory is precluded because section (B) states that liability "is exclusive and preempts
any other liability imposed . . . under common law or otherwise . . . ." Tex. Bus. Corp. Act
Ann. art. 2.21 (West Supp. 1995). We disagree with Foster's interpretation of the statute. His
interpretation does not account for subsection (B)(2), which provides a qualification to the rule. 
In fact, a holder's liability is not limited when the holder is otherwise liable under another
applicable statute. Id. Article 2.38(B) states: "A distribution may not be made by a corporation
if: (1) after giving effect to the distribution, the corporation would be insolvent . . . ." Tex. Bus.
Corp. Act Ann. art. 2.38(B) (West Supp. 1995). The distribution of substantially all of CRB's
assets effectively rendered the corporation insolvent and unable to pay its obligations to
King/Bumpous. Therefore, the distribution was unlawful under article 2.38(B) and falls within
the article 2.21(B)(2) qualification. We therefore overrule Foster's point of error contending that
the denuding theory is not subject to the limitations in article 2.21 set forth in his motion for
rehearing.

 In light of our disposition of King/Bumpous's first point of error, we do not address
their second point contending that the jury's failure to find Foster liable under the denuding theory
was against the great weight and preponderance of the evidence.



ALTER EGO THEORY


Sufficiency of the Evidence.

 In their third point of error, King/Bumpous assert that the jury's failure to find that
Foster used CRB as his alter ego was against the great weight and preponderance of the evidence.

 Question No. 3 inquired as follows:



 Did Tolbert Foster cause Colorado River Broadcasters, Inc. to be used to
perpetrate an actual fraud on Bryan King and Steve Bumpous, primarily for the
direct personal benefit of Tolbert Foster, by using the corporation as his alter ego?


 ANSWER: NO


 In accordance with article 2.21(A)(2), King/Bumpous bore the burden of proving
that by using the corporation as his alter ego, Foster used CRB to perpetrate an actual fraud on
King/Bumpous primarily for his direct personal benefit. According to the trial court's instructions
defining actual fraud, King/Bumpous had to establish that (1) Foster, or his representative with
Foster's knowledge, made a misstatement of material fact; (2) that was false; (3) made when
Foster or his representative knew of its falsity or acted with reckless disregard for its truth; (4)
made with the intention that it should be acted upon; (5) and the party to whom it was made relied
upon it and was harmed or damaged. 

 We will review the entire record to determine whether the jury's failure to find in
King/Bumpous's favor is so unjust in light of the evidence that the verdict cannot stand, having
due regard for the jury's collective wisdom, their opportunity to observe the witnesses, and our
incapacity to weigh the evidence and find a fact differently. Pool v. Ford Motor Co., 715 S.W.2d
629, 635 (Tex. 1986); William Powers, Jr. & Jack Ratliff, Another Look at "No Evidence" and
"Insufficient Evidence," 79 Tex. L. Rev. 515, 525-26 (1991). 



Review of the Evidence.

 King testified Foster saw King and Bumpous doing maintenance work at the station
facility many times over a period of months even though they never submitted any bills. Foster
was present at the meeting with Hawkins Broadcasting during which King played a large role in
presenting the Bastrop station's proposal. King stated he never mentioned the Agreement to
Foster.

 Bumpous also testified he never mentioned the Agreement to Foster, and that Foster
observed King/Bumpous doing work for the station. According to both King's and Bumpous's
testimony, Foster never made any misstatements of fact to them about CRB's planned role in
developing the Bastrop station. 

 Foster testified he and Walker made a business decision to form CRB to develop
and upgrade the Bastrop station based on tax considerations and limited personal liability. They
decided to leave the construction permit in Walker's name until it became convenient to transfer
it to CRB. It became convenient when a buyer appeared who wished to close the deal as quickly
as possible. At that point, Walker and Foster amended CRB's charter so that Foster's seventy
shares of outstanding stock became non-voting shares. This allowed them to apply to the FCC
for a transfer of the permit using a short form. This was the only reason to change the stock
ownership. Foster testified they made an effort to use the short form to accommodate an anxious
buyer, not to avoid giving anyone the right to protest. 

 Foster acknowledged he was aware that King and Bumpous were providing
engineering and technical assistance at the station, although he never saw a bill for such services. 
He said that when he and Walker agreed to sell the Bastrop station, he asked Walker if they were
going to owe King/Bumpous money, and Walker told him that he had a "side agreement" with
them. Foster did not inquire about the terms of that agreement, and did not think it odd that
Walker intended to pay King/Bumpous himself. Walker testified by deposition that he had not
disclosed the Agreement to Foster.

 Lee Peltzman, an attorney, testified by deposition that CRB's change in stock
ownership allowed Walker and Foster to use the shorter form to transfer ownership of the
construction permit to CRB. He stated that the advantages of using the short form are that it takes
less time, costs less money, and there is no 30-day waiting period and requirement of public
notice. 

 King/Bumpous played a tape recording of a telephone call between the two of them
and Foster that occurred in July 1989, after they were unable to contact Walker. They had not
told Foster they were recording the call. In the telephone call, Foster repeatedly stated he was
not aware of the Agreement. He further said, "I don't see how you could have an agreement with
Colorado River Broadcasters and me not be aware of it." At one point King stated, "I kind of
suspicioned that Bob had not shared that with you." Foster later said, "[Walker] wasn't
authorized to enter into that kind of agreement in my behalf."

 King/Bumpous argue that the evidence establishes that Foster participated in
intentionally concealing the true ownership of the Bastrop station. They rely heavily on Foster's
admissions that although he and Walker always intended to transfer the construction permit to
CRB when it became convenient, they continued to report Walker as the owner and manipulated
CRB's stock to avoid using the long form (with its requisite public notice) for the transfer of the
permit. 

 When considering great-weight points complaining of a jury's failure to find, we
are particularly mindful that the jury was not convinced by a preponderance of the evidence. 
Herbert v. Herbert, 754 S.W.2d 141, 144 (Tex. 1988). We may set aside the jury's failure to
find only if the great weight of that evidence dictates an affirmative answer. Id. As trier of fact,
the jury is the sole judge of the witnesses' credibility and the weight to be attached to their
testimony. Ethicon, Inc. v. Martinez, 835 S.W.2d 826, 834 (Tex. App.--Austin 1992, writ
denied). We may not pass upon the credibility of the witnesses and substitute our judgment for
that of the jury simply because some of the evidence would support a different conclusion. Allied
Towing Serv. v. Mitchell, 833 S.W.2d 577, 582-83 (Tex. App.--Dallas 1992, no writ). 

 Based on the above summary of the evidence, we cannot say that the jury's failure
to find Foster had purposefully used CRB to perpetrate a fraud on King/Bumpous is against the
great weight of the evidence. (30) We overrule King/Bumpous's third point of error.



COSTS


 In his second cross-point of error, Foster asserts the trial court erred in refusing
to award him his costs as a prevailing party without attempting to comply with Texas Rule of
Civil Procedure 141. 

 Texas Rule of Civil Procedure 131 provides: "The successful party to a suit shall
recover of his adversary all costs incurred therein, except where otherwise provided." However,
the trial court may adjudge costs otherwise, for good cause stated on the record. Tex. R. Civ.
P. 141. It is error for the trial court to assess costs other than in accordance with rule 131 unless
the court states its reasons on the record. Neal v. Ardoin, 594 S.W.2d 145, 147 (Tex. Civ.
App.--Houston [1st Dist.] 1980, no writ).

 In the final judgment, the trial court stated: 



 The Court finds that the costs of court incurred in this cause are not capable of
segregation as between Colorado River Broadcasters, Inc. and Tolbert Foster. The
Court therefore finds that good cause exists to adjudge the costs of court in the
manner provided below.


 IT IS ORDERED that . . . Colorado River Broadcasters, Inc. and Tolbert
Foster shall bear all costs of court incurred by them in this cause.



 Contrary to Foster's assertion, the trial court did comply with rule 141 by stating
good cause on the record. Moreover, Foster does not argue that the trial court's finding of good
cause was an abuse of discretion. See Rogers v. Walmart Stores, Inc., 686 S.W.2d 599, 601
(Tex. 1985) (review of trial judge's assessment of costs for good cause governed by abuse of
discretion standard). We overrule Foster's second cross-point of error.



CONCLUSION


 We reverse that portion of the judgment ordering that King/Bumpous's take nothing
by their claims against Foster under the denuding theory and remand that portion of the cause for
a new trial. We affirm the remainder of the judgment. 



 

 John Powers, Justice

Before Justices Powers, Kidd and B. A. Smith

Reversed and Remanded in Part; Affirmed in Part

Filed: March 15, 1995

Do Not Publish

1.   Foster and Walker were the only two shareholders of CRB. Foster, the president,
owned seventy percent of CRB stock; Walker, the vice-president and secretary, owned the
remaining thirty percent. They agreed that CRB would build and operate the radio
station, and that any profits would be divided in accordance with the division of CRB
stock ownership. 
2.   Walker negotiated the terms of the Agreement in May 1986, before CRB was
incorporated. However, Walker reduced the Agreement to writing and signed it in
October 1986, and King/Bumpous signed it in December 1986.
3.   King/Bumpous first became aware of CRB's existence after they had performed
under the Agreement. After constructing the station under a separate agreement with
Walker, they billed the station for their work in March 1987. CRB paid the bill.
4.   CRB received a total of $5.25 million for the Bastrop station.
5.   Foster testified that he received a check from CRB for $1,736,643.02; Walker
received a check for $741,704.15.
6.   King/Bumpous had seen Foster only a few times during the years the Bastrop
station was in development, and had not mentioned the Agreement to him. 
7.   CRB apparently purchased a large tract of land in Burnet as part of an
arrangement with a radio station in Burnet. CRB conveyed approximately five acres of
the tract to the Burnet station, which agreed to build a new tower on a site that would not
interfere with the Bastrop station. CRB still owns the remaining thirty-two acres
adjacent to the Burnet station's tower. King/Bumpous introduced the property tax
appraisal of the land that listed its market value as $42,055. In a footnote in their brief,
Foster and CRB object to the admission of the property tax appraisal as evidence of
market value, asserting that CRB paid nearly $100,000 for the land. They do not raise a
point of error in this regard. 
8.   [8]  Walker filed for bankruptcy and is not a party to this suit.
9.   [9]  Foster's liability on the basis that he used CRB as his alter ego or that he denuded CRB
of its corporate assets is dependent on CRB's liability under the Agreement. We therefore
address CRB's points first.
10.   Question No. 1 submitted the undisclosed principal theory as follows: "Did
Colorado River Broadcasters, Inc. contract with Bryan King and Steve Bumpous for
performance of the services outlined in the consulting agreement?" (Definitions and
instructions omitted). 
11.   The Agreement does not allude to CRB. The first sentence of the Agreement reads,
"For consulting services to Robert Walker, Bryan King and Steve Bumpous
(King/Bumpous) will receive an amount equal to 5.5% of the net proceeds when KSSR-FM is sold." Walker signed the Agreement simply as "Robert W. Walker."
12.  The agent is also individually liable on the contract, although the third party must
elect to recover from either the principal or the agent. Medical Personnel Pool of Dallas,
Inc. v. Seale, 554 S.W.2d 211, 214 (Tex. Civ. App.--Dallas 1977, writ ref'd n.r.e.). 
13.  In a post-submission brief, CRB appears to argue that the only type of authority a
principal may confer negligently is apparent authority. Apparent authority, unlike actual
authority, is based on estoppel and arises from the principal's conduct that would lead a
reasonably prudent third party to believe that the agent had authority to act. Curry v. Lone
Star Steel Co., 676 S.W.2d 205, 210 (Tex. App.--Fort Worth 1984, no writ). "Thus, both
actual and apparent authority depend for their creation on some manifestations, written or
spoken words or conduct by the principal communicated either to the agent (actual authority)
or to the third party (apparent authority)." Id. Because a finding of apparent authority
depends upon conduct by the principal manifested to a third party, there can be no apparent
authority when the principal is not disclosed. Morey v. Page, 802 S.W.2d 779, 785 (Tex.
App.--Dallas 1990, no writ). 
14.  A principal may also incur liability by subsequently ratifying the agent's
unauthorized acts, or by conduct amounting to estoppel. Longoria v. Atlantic Gulf Enters.,
Inc., 572 S.W.2d 71, 77 (Tex. Civ. App.--Corpus Christi 1978, writ ref'd n.r.e.).
15.  CRB properly preserved its legal insufficiency complaint by raising it in a motion
for judgment notwithstanding the verdict. See, e.g., Cecil v. Smith, 804 S.W.2d 509, 510-11 (Tex. 1991) ("no evidence" points may be raised by either: (1) a motion for instructed
verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the
submission of the issue to the jury; (4) a motion to disregard the jury's answer to a vital fact
issue; or (5) a motion for new trial). 
16.  Although Walker was CRB's vice-president, a corporate officer has no inherent
authority to bind by virtue of his office. See Templeton v. Nocona Hills Owners Ass'n, Inc.,
555 S.W.2d 534, 538 (Tex. Civ. App.--Texarkana 1977, no writ). A corporation's board of
directors, not its officers, is charged by statute with managing corporate affairs. See Tex.
Bus. Corp. Act Ann. art. 2.31 (West Supp. 1995); Templeton, 555 S.W.2d at 537; Ennis
Business Forms, Inc. v. Todd, 523 S.W.2d 83, 85 (Tex. Civ. App.--Waco 1975, no writ). 
17.  An express agency is usually created by written agreement and an implied agency is
created by an oral contract or a consensual relationship. Green, 369 S.W.2d at 856; see
also Orozco v. Sander, 824 S.W.2d 555, 556 (Tex. 1992) (noting existence of agency does not
depend on express appointment by principal, but may be implied from parties' conduct under
the circumstances); Carr v. Hunt, 651 S.W.2d 875 (Tex. App.--Dallas 1983, writ ref'd n.r.e.)
(noting consent of principal and agent necessary to create agency, which may be express or
implied by their words and conduct). There is no difference in principle between an express
and implied contract of agency, but the terms reflect differences in the character of proof by
which the relationship of principal and agent is established. McDorman v. Goodell, 69
S.W.2d 428, 432 (Tex. Civ. App.--El Paso 1934, no writ). 
18.  Article 2.42(B) provides: "All officers and agents of the corporation, as between
themselves and the corporation, shall have such authority and perform such duties in the
management of the corporation as may be provided in the bylaws, or as may be
determined by resolution of the board of directors not inconsistent with the bylaws." Tex.
Bus. Corp. Act Ann. art. 2.42(B) (West 1980).
19.  CRB does not point to any specific testimony by King or Bumpous during which
they quoted Walker, but objects generally to all such testimony.
20.  It is not entirely clear from CRB's brief whether it is arguing: (1) there was no
independent evidence that Walker was CRB's agent; or (2) although Walker was CRB's
agent, there was no independent evidence Walker was acting within the scope of his
authority in entering the Consulting Agreement with King/Bumpous. We will address
both contentions in our opinion.
21.  The general rule that an alleged agent's declarations are inadmissible against the
principal without independent evidence of agency does not apply to an agent's in-court
testimony. Cook v. Hamer, 309 S.W.2d 54, 58 (Tex. 1958). 
22.  Before the adoption of the Texas Rules of Civil Evidence in 1983, the law provided
that an agent's hearsay statements were admissible against the principal only after the
trial judge first found the statements were within the scope of the agent's authority to
speak on the principal's behalf. Norton v. Martin, 703 S.W.2d 267, 272 (Tex. App.--San
Antonio 1985, writ ref'd n.r.e.) (citing Big Mack Trucking Co. v. Dickerson, 497 S.W.2d
283, 288 (Tex. 1973)). 
23.  A party may recover attorney's fees under chapter 38 for a claim under an oral or
written contract. Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 1986).
24.  Ordinarily, the separate identity of a corporation shields its shareholders, officers,
and directors from personal liability for corporate obligations. Castleberry v. Branscum,
721 S.W.2d 270, 271 (Tex. 1986); Kern v. Gleason, 840 S.W.2d 730, 736 (Tex.
App.--Amarillo 1992, no writ). Courts will not disregard the corporate entity unless the
individuals are using the corporate form as a sham to perpetrate a fraud, to escape personal
liability, to avoid the effect of a statute, or in a few other exceptional situations. Torregrossa
v. Szelc, 603 S.W.2d 803, 804 (Tex. 1980); Bell Oil & Gas Co. v. Allied Chem. Corp., 431
S.W.2d 336, 340 (Tex. 1968); Pace Corp. v. Jackson, 284 S.W.2d 340, 351 (Tex. 1955). 
The purpose in disregarding the corporate entity is to prevent individuals from using the
corporate form as a cloak to commit fraud or illegal act. Castleberry, 721 S.W.2d at 273.
25.  The supreme court also noted three other theories which do not disregard the
corporate entity: the trust-fund doctrine, fraudulent conveyance, and breach of fiduciary
duties. Castleberry, 721 S.W.2d at 271 n.1.
26.  Foster asserts that the handful of decisions addressing the denuding theory
categorize it under the doctrine of disregarding the corporate entity. See Francis v.
Beaudry, 733 S.W.2d 331, 335 (Tex. App.--Dallas 1987, writ ref'd n.r.e.) (holding that both
the alter ego and denuding theories supported the plaintiff's right to pierce the corporate veil
and recover his claim directly from a stockholder); see also Inesco, Inc. v. Sears, 567 S.W.2d
827, 830 (Tex. Civ. App.--Beaumont 1978, writ ref'd n.r.e.) (stockholder held personally
liable on plaintiff's claim). This is incorrect in light of the supreme court's statement in
Castleberry that the denuding theory is not a basis on which to disregard the corporate entity,
but is a distinct doctrine. Castleberry, 721 S.W.2d at 271 n.1.
27. As the dissent noted in Castleberry, this holding was a significant departure from
previous decisions holding that the corporate veil would be pierced only in extraordinary
circumstances. Castleberry, 721 S.W.2d at 277 (Gonzalez, J., dissenting) (citations omitted). 
Such a standard allowed courts to pierce the corporate veil any time it would be unfair to
recognize the corporate existence. Id. In an apparent response to Castleberry, the legislature
amended article 2.21 in 1989. Act of May 12, 1989, 71st Leg., R.S., ch. 217, § 1, 1989 Tex.
Gen. Laws 974 (since amended). Article 2.21(A)(2) effectively overruled Castleberry by
requiring a party seeking to pierce the corporate veil to prove the shareholder purposefully
used the corporation to perpetrate an actual fraud. 
28.  This requested question is similar to the submission of the denuding theory in Hixon
v. Pride of Texas Distrib. Co., 683 S.W.2d 173, 176 n.2 (Tex. App.--Fort Worth 1985, no
writ), although the court did not address whether such a submission was correct.
29.  During his testimony Foster stated that the tract of land was CRB's only remaining
asset.
30.  Because we cannot say that the jury acted against the great weight and
preponderance of the evidence in failing to find Foster committed actual fraud, we do not
review the evidence regarding Foster's alleged use of CRB as his alter ego.